## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| Alphonso David<br><br>    Plaintiff,<br><br> v.<br><br>The Human Rights Campaign &<br>The Human Rights Campaign Foundation<br><br>    Defendants. | Case No.<br><br><br><br>**Jury Trial Demanded** |

## COMPLAINT

Plaintiff Alphonso David ("David"), by and through his attorneys, Stowell & Friedman, Ltd. and Matt Singer Law, LLC, hereby files this Complaint against Defendants The Human Rights Campaign and The Human Rights Campaign Foundation (hereinafter "HRC"), and states as follows:

## INTRODUCTION

1.      After serving the public for nearly two decades as a successful civil rights and government lawyer, David accepted a position as HRC's President in 2019. HRC was and is one of America's most prominent organizations advocating for LGBTQ+ rights and equality. Despite its equality-focused mission, the organization had a deserved reputation for unequal treatment of its non-white employees. HRC's own employees described it as a "White Men's Club," where non-white staffers were marginalized, tokenized, and denied advancement to high-level positions. David became the first Black President in the organization's 40-year history.

2.      David indisputably performed well as HRC President. He successfully navigated the organization through the COVID-19 pandemic and dramatically increased HRC's fundraising

to record levels. In 2021, in recognition of David's outstanding work as President, HRC renewed his contract for five additional years and gave him a 30% raise. During the contract renewal negotiations, the Co-Chairs of HRC's Board acknowledged that, for the past two years, HRC had underpaid David compared to his white predecessor because of his race.

3. Prior to serving as HRC President, David had worked in New York State Government and as counsel to then-Governor Andrew Cuomo. After a report was issued accusing Governor Cuomo of sexual harassment, HRC's Board issued a statement expressing "full confidence" in David's leadership and praising him for "extraordinary leadership during extremely challenging times." David suggested, and HRC agreed, that an outside investigation be conducted to examine whether David himself had done anything improper. HRC chose Sidley Austin to do the investigation.

4. HRC promised to disclose the findings of the report to the public in order to foster transparency.

5. David sat down with the Sidley Austin investigators for more than 10 hours and answered their questions. Late at night before Labor Day weekend, HRC's Board Co-Chairs called David to tell him to resign by 8 a.m. the next morning or he would be terminated for cause. David asked whether the Sidley Austin investigation had made any findings against him, or if a report would be issued explaining what he was accused of doing wrong. The Board Co-Chairs refused to say what the results of Sidley Austin's investigation were and stated to David's surprise, that despite HRC's public and private assurances of transparency, no report or findings would be issued to the public or to David.

6. Because David did not do anything wrong, and because HRC could not even articulate what it was accusing him of doing wrong, David refused to resign. In response, HRC

then retaliated against David and terminated his employment purportedly "for cause," depriving him of the benefits of the five-year contract the parties had just negotiated and executed.

7.     David's treatment, including his summary termination, differed markedly from how his white predecessor had been treated. During the tenure of David's predecessor, HRC had endured repeated, serious, scandals—many of which involved HRC's mistreatment of Black and other marginalized individuals. Nonetheless, HRC took no action against David's predecessor, let alone terminate him suddenly, "for cause."

8.     HRC underpaid David, and then terminated him, because he is Black.

## JURISDICTION AND VENUE

9.     Plaintiff's federal claim arises under 42 U.S.C. § 1981, and this Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343. This Court has supplemental jurisdiction over Plaintiff's state-law claims pursuant to 28 U.S.C. § 1367.

10.     Venue is proper in the Eastern District of New York pursuant to 28 U.S.C. §1391(b)(2). Plaintiff resides in this District and performed the bulk of his work for HRC in this District. HRC does business in this District. A substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

## PARTIES

11.     Defendant HRC is one of America's most prominent organizations dedicated to LGBTQ+ rights and equality. HRC's stated mission is to "end discrimination against LGBTQ+ people and realize a world that achieves fundamental fairness and equality for all."

12.     Plaintiff Alphonso David is a resident of New York City. Before he was hired as HRC's President in 2019, he had nearly two decades of experience as a civil rights and government lawyer and as a manager in both the private and public sectors.

**FACTUAL ALLEGATIONS**

13.     David's predecessor as President of HRC was Chad Griffin ("Griffin"), a white

man who served as HRC President from 2012 through 2019. Griffin left the organization

voluntarily, by announcing to the Board in late 2018 his plans to resign effective 2019.[1]

14.     During Griffin's tenure, HRC endured several scandals and reputational

challenges centered around its mistreatment of marginalized groups, including Black and

transgender people.

15.     In particular, in 2015, HRC conducted surveys and focus groups of its employees.

The results were memorialized in a report, known as the "Pipeline Report," which was leaked to

the press and disseminated publicly.[2]

16.     The Pipeline Report revealed that, among many other things, "[o]ne of the most

frequent concerns that arose was the sense of an organizational culture rooted in a white,

masculine orientation which is judgmental of all those who don't fit that mold." Specifically,

many employees reported that HRC was a "white man's club." Huge numbers of non-white or

trans/genderqueer HRC staffers reported that they weren't being treated equally and faced bias in

the workplace. Employees further reported a toxic work environment, where demeaning and

offensive language was regularly used. A majority of HRC employees, and 100% of Vice

Presidents, reported observing disparaging remarks or behaviors in the workplace. Finally,

employees reported that white male staffers were much more likely than others to be promoted to

the senior ranks of the organization and that non-white male staffers were regularly tokenized.

---

[1]     https://www.hrc.org/press-releases/hrc-president-chad-griffin-announces-departure-in-2019

[2]     https://www.buzzfeednews.com/article/chrisgeidner/internal-report-major-diversity-organizational-problems-at-h

17.     After the Pipeline Report was issued and leaked, HRC's toxic workplace environment under Griffin became a major public scandal for the organization. But HRC and its Board stood behind Griffin, declined to fire him for cause or otherwise, and allowed him to continue serving as HRC President.

18.     HRC publicly claimed to take steps to address the shortcomings discussed in the Pipeline Report. But its racist, biased culture remained intact. For example, in 2018, the white President of the HRC Foundation (HRC's educational arm) repeatedly used the word "nigger" in front of colleagues in the workplace. A public uproar ensued and the executive resigned, but Griffin suffered no consequences for continuing to allow HRC's toxic culture to flourish.

19.     After Griffin announced his voluntary resignation, effective in 2019, HRC began searching for his replacement. After a lengthy interview process, HRC offered David the position of President. The parties entered into an employment contract for a two-year term.

20.     During his initial two-year term, David's salary was considerably less than his predecessor Griffin's.

21.     David, as HRC President, occupied the same position and had the same responsibilities as Griffin.

22.     HRC paid David less than Griffin, for performing the same job, because David is Black.

23.     David performed extremely well as HRC President, by any measure. A few months into David's tenure, the COVID-19 pandemic ravaged the world, grinding the economy and public life to a halt. But David successfully steered HRC through the enormous challenges created by the pandemic.

24.     Despite his successes, David still was forced to navigate a racially hostile culture at HRC. For example, early in his tenure, David wrote and delivered a speech entitled "See Beyond Yourself," which focused on issues of race and indifference in the context of HRC's mission. After David delivered the speech, a prominent white board member confronted David in front of other HRC staff members, telling him: "We all know you're Black, why do you keep telling us that?" or words to that effect. No action was taken against the Board member. A few months later, the same white Board member belittled a Black female Board member in front of the entire Board. Only after David raised with the Board the impropriety of the comments targeting the Black Board member and reminded the Board of the prior incident did the Board take action to address the white Board member's misconduct.

25.     In addition, at the same event where the Board member criticized David for giving a speech regarding race, HRC Board Co-Chair Jodie Patterson ("Patterson") expressed concerns to a guest that the organization was not ready for a Black President.

26.     David regularly received pushback from senior colleagues at HRC on issues of race. For example, after George Floyd's murder sparked a national reckoning about racism in America, David caused HRC to issue a statement supporting Black Lives Matter and the movement for racial justice. David subsequently received pushback from Chris Speron ("Speron"), HRC's Senior Vice President of Development, who expressed concern about "alienating" white donors and specifically "white gay men." Similarly, Speron pushed David to stop mentioning in his public statements and remove from his bio the fact that he was HRC's first Black President in its history.

27.     Speron also expressed displeasure about hiring a Black-owned consulting firm. He criticized a Black staff member for attending a meeting with the consulting firm without a

white person present. Speron told the Black staff member that he "would prefer that you not meet with them like that. I just know how it could be when Black people get together like that. It will be just like all the Black people looking out for each other. I don't want them to not perform because they think that just because you are Black you are going to bail them out," or words to that effect.

28. Despite the racial hostility that continued to exist at the organization, David's performance as HRC President exceeded all expectations. Among many other successes, David shattered HRC's previous fundraising records, bringing in $60 million for the organization during a time of enormous upheaval.

29. In recognition of David's outstanding performance as its President, HRC sought to renew his contract. In May 2021, the HRC Board's Co-Chairs Morgan Cox ("Cox") and Jodie Patterson invited David to a lengthy dinner at Indochine in New York City to discuss the renewal of David's contract.

30. At this dinner, Cox and Patterson admitted to David that HRC had paid him less than his predecessor for performing the same work.

31. Further, both Cox and Patterson acknowledged that the pay discrepancy was because of David's race.

32. David and HRC ultimately agreed to a five-year extension of David's contract. In recognition of David's outstanding performance as President, the renewal contract provided David a 30% raise as compared to the initial contract. The parties fully executed the renewal contract dated July 17, 2021.

33. The renewal negotiations occurred while David's former employer, New York Governor Andrew Cuomo ("Cuomo"), was under scrutiny and investigation for sexual

harassment. David, among other former government employees, was subpoenaed as part of the Attorney General's investigation and answered questions in response to the subpoena. The investigators specifically told David's attorney that David was not to discuss the investigation with anyone other than his attorney and threatened him with criminal prosecution if he disclosed information about the investigation.

34.     On August 3, 2021, the Attorney General issued a report concluding that Cuomo harassed 11 women. David—who served as the Governor's counsel for several years—was mentioned several times in the report but was not accused of any wrongdoing. The day the report was released, David wrote on Twitter: "After reading the AG's devastating report that concluded Gov. Cuomo engaged in a pattern of sexual harassment, in violation of both federal and state law, he should resign."

35.     On August 4, 2021, after the Attorney General's report was released, the HRC Board issued the following statement in support of David: "The Human Rights Campaign and Human Rights Campaign Foundation Boards have full confidence in Alphonso David as president of the organization. In recognition of his extraordinary leadership during extremely challenging times, we were proud to extend his contract to stay on in his role for five more years. For the last two years he has been boldly leading the organization as it works to achieve its mission: full equality for all LGBTQ people, in the midst of a global pandemic, a nationwide reckoning on racial justice, and the most important presidential election in our lifetimes."

36.     David suggested, and HRC's Board agreed, to hire an outside law firm to investigate whether David had engaged in any wrongdoing related to his work for Governor Cuomo.

37.     HRC promised to be transparent in the findings of the investigation.

38.     The Board hired Sidley Austin to conduct the investigation. David participated in the investigation, answering questions from Sidley Austin investigators for more than 10 hours.

39.     Late at night on September 2, David received a call from Cox and Patterson. They informed David that he would be given until 8 a.m. the following morning to resign; otherwise HRC would terminate him "for cause." David pressed Cox and Patterson to explain what the Sidley Austin investigation had concluded, what findings it had made, and what purported wrongdoing David engaged in that would justify terminating him for cause. Cox and Patterson were unable or unwilling to answer.

40.     When asked why he needed to respond in less than 24 hours and especially without any findings, Cox and Patterson explained that they felt a weekend decision "will fall quietly on press." They further advised that a weekend decision was best for the organization and the Board.

41.     David refused to resign because he did not believe he had done anything wrong and HRC would not or could not articulate what he had done wrong. The Sidley Austin investigation, as far as David knew, revealed nothing apart from what was already in the Attorney General's report, which HRC was aware of when it issued a statement supporting him on August 4. And HRC's previous (white) President had become involved in enormous and damaging public scandals, relating directly to his leadership of the organization, without suffering any adverse employment consequences.

42.     On September 6, 2021, HRC terminated David, purportedly "for cause."

43.     HRC's discriminatory decision to suddenly fire David—without identifying or articulating anything that David had actually done wrong—while tolerating years of reputational crises under his white predecessor is consistent with the social science literature examining how

9

discrimination against high-level minority executives occurs in practice. Organizations in crisis are more likely to hire a minority leader than organizations that are stable and successful; social scientists describe this phenomenon as the "glass cliff."[3] And when minorities receive an opportunity to lead, they are held to different standards: unlike white men, confidence in minority leaders tends to be "tenuous" and "racial/ethnic minority leaders are granted limited opportunities to demonstrate their capabilities."[4] Minority leaders are perceived as "riskier," face pressure to be "perfect" and are subject to the "one mistake rule": one slip-up and they will be replaced.[5] And, when it comes to issues relating to leaders' ethics, the social science explains that Black leaders tend to be treated differently, and more negatively, than white leaders: "Black leaders' ethics are judged more harshly than similarly situated White leaders when there is some negative information available about the leader that results in activation of a negative stereotype about Black leaders."[6]

44.     Under his employment agreement, David's employment could be terminated either "for cause" or without cause. If HRC terminated David without cause, it was required to provide David with 180 days written notice and would owe David certain severance benefits if David elected to sign a release. A termination for cause, in contrast, required no notice period and would deny David any severance benefits or monetary compensation.

45.     David's employment agreement specified that HRC could terminate David "for cause" only if certain conditions had been met. The notice of termination referenced two clauses

---

[3]     *See, e.g.*, Alison Cook, Christy M. Glass, *Analyzing Promotions of Racial/Ethnic Minority CEOs*, J. OF MANAGERIAL PSYCHOLOGY 29-4:440-454 (2014).
[4]     *Id.*
[5]     Christy Glass, Alison Cook, *Pathways to the Glass Cliff: A Risk Tax for Women and Minority Leaders*, SOCIAL PROBLEMS 67:637-653 (2020).
[6]     Dennis J. Marquardt, Lee Warren Brown, Wendy J. Casper, *Ethical Leadership Perceptions: Does it Matter if You're Black or White?*, J. BUS. ETHICS (2018) 151:599–612.

as purportedly justifying David's termination for cause: "(iv) any act or omission by Executive which results or may be expected to result in material damage to HRC/HRCF's interests reputation or prospects;" and "(vi) any act or omission by Executive, which, in HRC/HRCF's sole discretion, creates damage to Executive's reputation significant enough to impair Executive's ability to effectively serve as the public face and voice of HRC/HRCF." Neither in the notice of termination nor in any of its communications with David did HRC identify any particular act or omission by David that satisfied either of these criteria.

46.     Further, after David raised concerns with certain Board members that white leaders had engaged in conduct that led to "reputational harm" and there was no repercussions against those leaders, HRC then decided to publicly malign David's name by claiming "conflict of interest" as a basis for its decision. But the Board never advised David of any conflict and HRC failed to reference any "conflict of interest" in the notice of termination submitted to David. The "conflict of interest" claim cited publicly by HRC is nothing more than pretext to further advancing their discriminatory actions.

47.     HRC lacked any valid reason to terminate David for cause. HRC's decision to terminate David for cause—and deny him contractual notice and severance benefits—was motivated by the same discriminatory animus that resulted in HRC paying him less for filling the same position as his white predecessor.

48.     As a direct and proximate result of HRC's illegal conduct, David has suffered significant financial losses.

49.     As a direct and proximate result of HRC's illegal conduct, David has suffered significant emotional and mental distress, embarrassment and humiliation, loss of enjoyment of life, inconvenience, and other non-pecuniary losses.

50.    As a direct and proximate result of HRC's illegal conduct, David has suffered a

loss of reputation that has permanently damaged his career and hampered his future employment

opportunities.

51.    Punitive damages are appropriate because HRC's discriminatory conduct was

malicious and/or recklessly indifferent to Plaintiff's protected rights.

**COUNT I**

**RACE DISCRIMINATION IN VIOLATION
OF 42 U.S.C. § 1981**

52.    Plaintiff realleges the above paragraphs and incorporates them by reference as

though fully stated herein as part of Count I of this Complaint.

53.    42 U.S.C. § 1981 guarantees persons of all races the same right to make and

enforce contracts, regardless of race.  The term "make and enforce" contracts includes the

making, performance, modification, and termination of contracts, and the enjoyment of all

benefits, privileges, terms, and conditions of the contractual relationship.

54.    As described above, HRC maintained discriminatory employment practices that

constituted illegal race discrimination in violation of 42 U.S.C. § 1981. Among other things,

HRC paid David less than his white predecessor and terminated his employment "for cause"

because of his race, Black.

55.    Plaintiff was subjected to and harmed by HRC's discrimination based on his race,

Black.

56.    As a direct and proximate result of HRC's illegal, racially discriminatory conduct,

Plaintiff has suffered damages.

## COUNT II

## NEW YORK EQUAL PAY ACT

57.     Plaintiff realleges Paragraphs 1 through 51 and incorporates them by reference as if they were fully restated herein.

58.     The New York Equal Pay Act prohibits employers from paying employees of different races different wages for "(a) equal work on a job the performance of which requires equal skill, effort and responsibility, and which is performed under similar working conditions, or (b) substantially similar work, when viewed as a composite of skill, effort, and responsibility, and performed under similar working conditions." New York Lab. Law § 194(1).

59.     HRC violated the New York Equal Pay Act by paying David, who is Black, less than his white predecessor for equal or substantially similar work.

60.     Plaintiff has suffered damages as a result of HRC's violation of the New York Equal Pay Act.

61.     Treble damages should be awarded under New York Lab. Law § 198 because HRC's violation was willful.

## COUNT III

## RACE DISCRIMINATION IN VIOLATION OF NYSHRL

62.     Plaintiff realleges Paragraphs 1 through 51 and incorporates them by reference as if they were fully restated herein.

63.     The New York State Human Rights Law ("NYSHRL"), NY Exec. Law § 290, *et seq.*, establishes that it is unlawful, because of an individual's race, "to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment." N.Y. Exec. Law § 296(1)(a).

64. HRC violated the NYSHRL by discharging David from employment and discriminating against him in compensation and in terms, conditions, or privileges of employment, because of his race, Black.

65. Plaintiff has suffered damages as a result of HRC's violation of the NYSHRL.

## COUNT IV

## RACE DISCRIMINATION IN VIOLATION OF NYCHRL

66. Plaintiff realleges Paragraphs 1 through 51 and incorporates them by reference as if they were fully restated herein.

67. The New York City Human Rights Law ("NYCHRL"), NYC Admin Code § 8-101, *et seq.*, establishes that it is unlawful, because of an individual's race, "to bar or to discharge from employment such person," or to "discriminate against such person in compensation or in terms, conditions or privileges of employment." NYC Admin Code § 8-107.

68. HRC violated the NYCHRL by discharging David from employment and discriminating against him in compensation and in terms, conditions, or privileges of employment, because of his race, Black.

69. Plaintiff has suffered damages as a result of HRC's violation of the NYCHRL.

## COUNT V

## BREACH OF CONTRACT

70. Plaintiff realleges Paragraphs 1 through 51 and incorporates them by reference as if they were fully restated herein.

71. David and HRC entered into an employment agreement in 2019. The parties renewed that agreement in 2021.

72. David performed all of his obligations under the contract and satisfied all conditions precedent to HRC's obligations under the contract.

73. Under the agreement, HRC could terminate David's employment "for Cause" only if certain circumstances existed.

74. None of the circumstances that would have justified a termination "for Cause" actually existed. Nonetheless, and in violation of the contract, HRC purported to terminate David "for Cause."

75. Moreover, every contract includes an implied covenant of good faith and fair dealing. That covenant governs a party's exercise of discretion under the contract. To the extent HRC had contractual discretion, it exercised that discretion in bad faith to deny Plaintiff the contractual benefits he was entitled to for a "without cause" termination.

76. As a direct and proximate result of HRC's breach of contract, Plaintiff suffered damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court find against HRC as follows:

a. Declare that HRC's acts, conduct, policies, and practices are unlawful and violate 42 U.S.C. § 1981, the New York Equal Pay Act, the NYSHRL, the NYCHRL, and Plaintiff's Employment Agreement;

b. Reinstate Plaintiff to his former position;

c. Award Plaintiff the value of all compensation and benefits lost and that he will lose in the future as a result of HRC's unlawful conduct;

d. Award Plaintiff compensatory and punitive damages;

e. Award Plaintiff liquidated damages and treble damages under the New York Equal Pay Act;

f.      Award Plaintiff the compensation and benefits he is entitled to under Section 5(a) of his Employment Agreement for a termination without cause;

g.      Award Plaintiff prejudgment interest and attorneys' fees, costs and disbursements, as provided by law;

h.      Award Plaintiff such other make whole equitable, injunctive and legal relief as this Court deems just and proper to fairly compensate Plaintiff;

i.      Award Plaintiff such other relief as this Court deems just and proper.

## DEMAND FOR A JURY TRIAL

Plaintiff hereby demands a jury trial as provided by Rule 38(a) of the Federal Rules of Civil Procedure.

Respectfully submitted on behalf of Plaintiff,

By:      */s/ Shona B. Glink*

Linda D. Friedman (admission *pro hac vice* pending*)*
Shona B. Glink
STOWELL & FRIEDMAN LTD.
303 W. Madison, Suite 2600
Chicago, Illinois 60606
Phone: (312) 431-0888

Matthew J. Singer (admission *pro hac vice* pending)
MATT SINGER LAW, LLC
77 W. Wacker Dr., Suite 4500
Chicago, Illinois 60601
Phone: (312) 248-9123
Matt@MattSingerLaw.com